T.C. Memo. 1996-211


UNITED STATES TAX COURT


HARRIS LEVIN AND GAYLE LEVIN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 43572-85.                     Filed May 1, 1996.


<u>Bruce I. Hochman</u> and <u>Martin N. Gelfand</u>, for petitioners.

<u>Mark Bernsley</u>, for petitioner Gayle Levin.

<u>Jason M. Silver</u>, for respondent.


MEMORANDUM OPINION

COHEN, <u>Judge</u>:  This case is now before the Court as a result
of the motion of petitioner Gayle Levin (Ms. Levin) for leave to
file out of time a motion to vacate a stipulated decision entered
August 10, 1989.  Ms. Levin contends that her former husband,
petitioner Harris Levin (Mr. Levin), conducted this proceeding

and signed her name to the stipulation for decision without authority and that his conduct constituted a fraud on the Court.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. Ms. Levin resided in California at the time the petition was filed.

### Background

Petitioners were married in 1963, shortly after Ms. Levin graduated from the University of California at Los Angeles with a bachelor of arts in general elementary education. During the course of their marriage, Mr. Levin was in the construction business and Ms. Levin was employed as a teacher with the Los Angeles Unified School District. They had two children. Petitioners separated during 1975 and reconciled during 1976. Their marriage was ultimately dissolved December 28, 1994.

During the course of their marriage, the parties maintained joint checking accounts. Ms. Levin wrote checks on joint accounts to pay the mortgage and other household bills. Mr. Levin, however, maintained control over the financial affairs of the couple.

In 1980, petitioners, along with other members of their tennis club, invested in certain tax shelter partnerships promoted by Gerald Schulman. Petitioners' contact with the Schulman partnerships was through Alan Letterman. Ms. Levin

signed the investment documents at the direction of Mr. Levin. Petitioners filed a joint Federal income tax return for 1980, claiming losses of $128,968 arising out of their Schulman partnerships. They also claimed a net operating loss carryback to 1979.

In entering into the Schulman partnerships, investors, including petitioners, had been assured that they would receive legal representation if the Internal Revenue Service (IRS) challenged their deductions. Schulman employed Bruce I. Hochman (Hochman) and Martin N. Gelfand (Gelfand) to represent the investors. After they were audited, investors sent their statutory notices of deficiency to Schulman. Schulman's office prepared petitions to this Court from forms provided by Gelfand. The petitions were sent to Gelfand for signature and were returned to Schulman's office for filing. Gelfand's office sent communications concerning the partnerships to Schulman's office for dissemination to the investors. Few, if any, of the investors ever met with Gelfand. Ms. Levin never met Gelfand, and Gelfand had no personal familiarity with petitioners' situation.

Sometime prior to March 1982, an audit of petitioners' 1980 tax return was commenced by the IRS. In March 1982, Mr. Levin executed a Form 2848, Power of Attorney, authorizing Ronald I. Anson (Anson), C.P.A., to act with respect to petitioners' 1980

tax return.  Mr. Levin signed his name and Ms. Levin's name to the Form 2848.  In August 1982, Anson and the IRS executed a Form 872-A, extending indefinitely the period of limitations for assessment of petitioners' taxes for 1980.

On September 17, 1985, the IRS sent to petitioners a statutory notice of deficiency, determining deficiencies of $41,609 for 1979 and $129,895 for 1980 in petitioners' Federal income taxes.  On December 5, 1985, a petition was filed in this case by Hochman and Gelfand as attorneys of record.  This case was associated with numerous cases involving Schulman tax shelters.  On August 10, 1989, the decision was entered pursuant to a stipulation bearing the original signature of Gelfand.  The stipulation also bore a machine copy of signatures appearing to be those of petitioners.  The decision determined that there was no deficiency for 1979 and that there was a deficiency in petitioners' Federal income tax for 1980 in the amount of $129,895.  The decision became final 90 days thereafter.  Secs. 7481(a)(1), 7483.

On December 4, 1991, petitioners delivered an Offer in Compromise to the IRS, seeking an agreement to reduce their liability for 1980 income taxes.  That offer was rejected on February 16, 1992.  On May 13, 1992, petitioners filed a petition in bankruptcy.  An order of discharge was dated September 11, 1992.  On July 16, 1993, a Notice of Levy on Wages, Salary, and

Other Income was issued by the IRS to the Los Angeles Unified School District. The notice stated, in part: "This levy is attached to the taxpayer's retirement pension only. It should not be attached to the taxpayer's wages."

In 1993, Ms. Levin consulted new counsel in relation to attempts by the IRS to collect petitioners' tax liabilities from Ms. Levin's interest in the teachers' retirement fund. Counsel attempted unsuccessfully to secure administratively "innocent spouse" relief for Ms. Levin from the IRS. In 1995, counsel decided that Ms. Levin also had a statute of limitations defense to the tax liability because she had not signed the Form 2848, Power of Attorney, or otherwise agreed to the extension of the period of limitations. On September 28, 1995, Ms. Levin's Motion for Leave to File Motion to Vacate Decision Out of Time was filed and an accompanying Motion to Vacate Decision was lodged. The motion to vacate is made on the grounds that the decision was entered as a result of a fraud upon the Court and without personal jurisdiction over Ms. Levin. Ms. Levin seeks to vacate the decision only as to 1980.

## Discussion

Because the decision entered in this case has long been final, to be successful in her pending motion, Ms. Levin must establish that the decision was secured either by a fraud on the Court or that the Court lacked jurisdiction over her. See,

generally, <u>Billingsley v. Commissioner</u>, 868 F.2d 1081, 1084 (9th Cir. 1989), revg. an unpublished order; <u>Toscano v. Commissioner</u>, 441 F.2d 930, 934 (9th Cir. 1971), vacating and remanding 52 T.C. 295 (1969); <u>Brannon's of Shawnee, Inc. v. Commissioner</u>, 69 T.C. 999, 1002 (1978).

Ms. Levin contends and testified that she did not authorize Mr. Levin to execute the power of attorney in favor of Anson, did not authorize Anson to extend the period of limitations, did not authorize Gelfand or anyone to file a petition on her behalf, and did not agree to the settlement of this case or authorize anyone to do so on her behalf. She recounts a series of grievances against Mr. Levin over most of their 30-year marriage.

Mr. Levin testified pursuant to subpoena served by respondent and denied many of Ms. Levin's accusations. He testified that he showed her or told her about all material correspondence involving the Schulman matter and that she authorized him to sign her name to the power of attorney and stipulation. Ms. Levin attacks Mr. Levin's credibility. She disputes his claimed lack of recollection of 1975 divorce proceedings. She argues that his apparent simulation of her signature refutes his claim of authority, asserting that, if he were truly authorized, he would not have found it necessary to make the signature look like hers.

Respondent asserts Mr. Levin's credibility and lack of motive to testify falsely. Respondent contends that Ms. Levin's denial of Mr. Levin's authority is an afterthought. Respondent contends that Ms. Levin's conduct after the decision was entered, particularly her participation in an Offer in Compromise and in the bankruptcy proceedings, shows that she authorized or ratified the petition in this case.

The issue here is not relative fault during the unhappy marriage of petitioners. The issue is whether Mr. Levin acted within the scope of authority granted by Ms. Levin when he authorized Schulman and Gelfand to file a petition and to settle this case on behalf of petitioners. The execution of the power of attorney and the subsequent extension of the period of limitations are not material unless the decision is vacated either for lack of jurisdiction or because there was a fraud on the Court.

The testimony of petitioners is conflicting. The testimony of the other witnesses, Anson, Gelfand, and an expert handwriting analyst, does not address directly the question of Mr. Levin's authority. There is no objective evidence from which we can find that one or the other petitioner is testifying falsely. We believe, however, that the passage of time, the emotional entanglements of the parties, and the conflicting interests of petitioners in this proceeding render the assertions of each of

them as to actual knowledge and authority or lack of actual knowledge or authority unreliable.  We have said that "the distillation of truth from falsehood * * * is the daily grist of judicial life."  Diaz v. Commissioner, 58 T.C. 560, 564 (1972). In these circumstances, we must look to the objective conduct of petitioners and to their specific testimony, especially that of Ms. Levin, to determine whether it is consistent or inconsistent with her having placed authority in Mr. Levin to act on her behalf.  If Mr. Levin had such authority, we have jurisdiction. Moreover, if he had such authority, there was no fraud on the Court.

Ms. Levin argues that she did not learn about her innocent spouse claim until 1993 or her statute of limitations defense until 1995 and, therefore, her failure to challenge the tax deficiency earlier is not an indication that she authorized or ratified the petition.  Ms. Levin's argument is misplaced that her conduct only after she was aware of all of her legal options can be considered.  She essentially is saying:  "If I knew then what I know now, I would have done things differently."  The relevant course of conduct is what she did then.  In this regard, we believe that the specific statements made during her testimony are more revealing than her generalized denials of actual knowledge of or authorization of the steps being taken with respect to her tax liability.

Ms. Levin acknowledged that she was aware of and signed documents relating to the Schulman partnerships. She reduced the withholding tax on her wages when Mr. Levin told her that the deductions would reduce the amounts owed to the Government. She also knew that Mr. Levin had, on some occasions, signed tax documents on her behalf, although she denied authorizing him to do so. On direct examination by her counsel, Ms. Levin testified that petitioners had many arguments about Mr. Levin's signing tax documents on her behalf. Specific questions and answers during her testimony included the following:

Q [by respondent's counsel] You signed your married filing joint tax returns in 1979 and 1980?

A I don't know. I -- sometimes I was given them to sign. Sometimes I was not. They were already sent in.

* * * * * * *

Q [by Ms. Levin's counsel] When did you first hear that the IRS was examining your tax liability regarding the Schulman Partnerships?

A * * * I first heard about it when Harris told me that there was a problem. But I assumed that was taken care of. And then there was a meeting at the Hilton Hotel with all -- with a bunch of people who had been involved in this and some attorney was coming from, I believe, another state.

And he wanted to, I guess, sue Schulman for having these illegal -- these -- this illegal tax, I guess it was a scheme. I guess, and I wanted Harris to go with me and he said, no, he wasn't going and --

* * * * * * *

THE WITNESS [Ms. Levin]:  And I went to this meeting by myself and I was surprised at all the people who were there.  * * *

And I found out that they all had different names on them.  And this woman was sitting next to me and she asked me how much money I owed and I said, "Well," you know, I said, "it's still -- it's being taken care of." And she said, "Oh, no.  This has been finalized a long time ago."  And she said she owed $20,000 and she paid it.  And I didn't know anything about this.

I went home and I asked Harris about it.  And he said nope, that it was still being worked on and that Alan Letterman was taking care of it.

(Litigation by Schulman investors was commenced in 1987 and 1988.

See Marine v. Commissioner, 92 T.C. 958, 970 (1989), affd.

without published opinion 921 F.2d 280 (9th Cir. 1991).)


Q  [by Ms. Levin's counsel]  Okay.  Did you ever participate in the tax audit regarding the Schulman investment?

A  No.

Q  Did Harris ever volunteer information concerning that examination?

A  No, only when I would ask.  If I asked what was happening, it was being taken care of.

Q  And what did that mean to you, that "it was being taken care of"?

A  He would say that Alan Letterman was taking care of it.

Q  Did that have any significance to you?  What did that mean to you?

A  It meant that it would be taken care of.

*      *      *      *      *      *      *

Q  How did you think your tax liability arose?

A  I was told that the first year of this post office deal was not going to be allowed but that Schulman was working it out and it would be taken care of.  * * *

Q  And then later you learned that in fact some liability had been determined?

A  Yes.

Q  Do you have any idea how it got from a maybe to a this is it?

A  No.

Thus, Ms. Levin's testimony indicates that she relied on Mr. Levin's assurance that the tax dispute arising out of petitioners' Schulman investment "was being taken care of."  Our interpretation of her testimony is that she implicitly authorized him to take appropriate steps, which included, through professional agents, the petition in this case.

In support of her motion, Ms. Levin relies on Abeles v. Commissioner, 90 T.C. 103 (1988); Levitt v. Commissioner, 97 T.C. 437 (1991) (Levitt I); and Levitt v. Commissioner, T.C. Memo. 1993-294 (Levitt II).  In Abeles, however, the taxpayers were in the process of divorce around the time that the notice of deficiency was mailed and the petition and amended petition were filed.  Mrs. Abeles was unaware of the tax dispute until her bank accounts were levied and a lien was placed on her residence.

In Levitt I, no decision had been entered at the time that Mrs. Levitt asserted her husband's lack of authority to file a

petition or settle a case on her behalf. She denied signing a joint tax return, and respondent asserted that the Court did not have jurisdiction because she neither filed nor ratified the petition filed by her husband. All parties agreed that Mrs. Levitt did not authorize Mr. Levitt to file the petition in the case on her behalf. In Levitt II, a motion to vacate a decision for lack of jurisdiction was granted. The Court concluded that the facts shown may have vested implied authority in Mr. Levitt to file Federal income tax returns on behalf of Mrs. Levitt but that "the nexus between that authority and the authority to file a petition on her behalf in this Court is simply not there."

In this case, however, the nexus missing in Levitt II is present. That is, Ms. Levin was aware that a dispute over their taxes had arisen and was repeatedly assured by Mr. Levin that it was being taken care of. She thus implicitly authorized those steps that reasonably followed the tax dispute through this Court. We believe that the cases relied on by respondent, although each factually specific, are analogous. See, e.g., Kraasch v. Commissioner, 70 T.C. 623, 626-628 (1978); Takamoto v. Commissioner, T.C. Memo. 1996-94; Stillman v. Commissioner, T.C. Memo. 1995-591; DiSanza v. Commissioner, T.C. Memo. 1993-142, affd. without published opinion 9 F.3d 1538 (2d Cir. 1993); John Arnold Executrak Sys., Inc. v. Commissioner, T.C. Memo. 1990-6.

Whether Ms. Levin's failure to ask for more details concerning how the matter was being "taken care of" was due to indifference or, as she suggests, to avoid angering Mr. Levin, she left to him decisions to be made concerning handling of the tax dispute. Ms. Levin has not suggested that she had any reason not to file a petition. None of the steps that he took was beyond the scope of his implied authority.

Upon consideration of the entire record, we conclude that the steps taken by Mr. Levin to prosecute and resolve this case were authorized by Ms. Levin. She has not established any ground for vacating the decision entered in 1989.

<u>Petitioner Gayle Levin's Motion for Leave to File Motion to Vacate Decision Out of Time will be denied</u>.